UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

QUAVAS SIMS,

                              Petitioner,

            -against-

SUPERINTENDENT DALE ARTUS,

                              Respondent.

14cv4734 (VEC) (DF)

**REPORT AND
RECOMMENDATION**

---

**TO THE HONORABLE VALERIE E. CAPRONI, U.S.D.J.:**

*Pro se* Petitioner Quavas Sims ("Petitioner"), who is currently incarcerated at Auburn
Correctional Facility, has filed a petition (the "Petition" or "Pet.") in this Court for a writ of
habeas corpus under 28 U.S.C. § 2254, following his conviction, after a bench trial, of one count
of Rape in the First Degree, in violation of N.Y. Penal Law § 130.35; one count of Criminal
Sexual Act in the First Degree, in violation of N.Y. Penal Law § 130.50; two counts of Assault in
the Third Degree, in violation of N.Y. Penal Law § 120.00; one count of Menacing in the Second
Degree, in violation of N.Y. Penal Law § 120.14; and one count of Criminal Possession of a
Weapon in the Fourth Degree, in violation of N.Y. Penal Law § 265.01.  Petitioner, a second-
time violent offender, was sentenced to concurrent sentences of 25 years' imprisonment on the
counts of first-degree rape and first-degree criminal sexual act, and concurrent sentences of one
year's imprisonment on each of the remaining charges, to be followed by 25 years of post-release
supervision.

Petitioner challenges his conviction on four grounds:  (1) that the evidence at trial was
legally insufficient to support his convictions for first-degree rape and first-degree criminal
sexual act (Pet., at 7-17); (2) that prosecutorial misconduct deprived him of his right to a fair trial
(*id*., at 17-19); (3) that he received ineffective assistance of counsel from his original trial

counsel, who was later relieved and replaced by another attorney (*id.*, at 20-22); and (4) that the

trial court was biased against him (*id.*, at 22-26).  Respondent Dale Artus, Superintendent of

Attica Correctional Facility, where Petitioner was previously incarcerated,[1] contends that

Petitioner's first, second, and fourth claims should be dismissed as procedurally barred and

without merit, and that Petitioner's third claim should be dismissed as unexhausted, procedurally

barred, and without merit.  (*See generally* Respondent's Memorandum of Law in Opposition to

Petitioner's Petition for a Writ of Habeas Corpus, dated Nov. 5, 2014 ("Resp. Mem.") (Dkt. 22).)

For the reasons set forth below, I recommend that the Petition be dismissed in its entirety.

## BACKGROUND

### A.    Factual Background

Based on the testimony elicited by the prosecution at Petitioner's trial, the facts

underlying Petitioner's conviction were as follows:

Marlene[2] first encountered Petitioner in November or December 2008, during a gathering

of friends at Marlene's apartment in the Bronx, where she lived with her one-and-a-half-year-old

daughter.  (*See* Transcript of Trial, conducted June 23, 2010 to Oct. 6, 2010 ("Trial Tr.")

(Dkt. 23), at 158-60.)  Upon realizing that neither she nor any of her friends had invited

Petitioner to her home, Marlene asked him to leave, which he did.  (*Id.*, at 159-60.)  After that

first meeting, Marlene would say hello to Petitioner whenever she walked past him in the

neighborhood, which happened "every day" on her way to or from work or a nearby grocery

---

[1] Superintendent Artus was properly named as Respondent in this action at the time that the Petition was filed, but Petitioner was later transferred to Auburn Correctional Facility. Although the Superintendent of Auburn Correctional Facility is now the appropriate respondent, this substitution would not affect the Court' analysis of Petitioner's claims.

[2] Pursuant to N.Y. Civil Rights Law § 50-b, the victim's full name has been omitted; she will be referred to as "Marlene."

store. (*Id.*, at 160.)  Gradually, their brief greetings grew into longer conversations, and Marlene

began to invite Petitioner to her apartment to talk and watch movies. (*Id.*, at 160-61.)  Petitioner

started persistently asking Marlene to be his girlfriend, but Marlene rejected his requests because

she had reservations about dating a younger man. (*Id.*, at 162.)  Eventually, on about January 5,

2009, Marlene agreed to become Petitioner's girlfriend because she thought that Petitioner was

"a gentleman" who was "very sweet, very respectful" and who "never talked about sex" or

"inappropriate stuff." (*Id.*, at 162-63.)

On January 14, 2009, however, their relationship changed.  At approximately 2:30 a.m.,

Petitioner came to Marlene's apartment, told her to sit down, and asked her, face-to-face, from

two to three inches away, whether she was "fucking anyone." (*Id.*, at 163-65.)  When Marlene

denied that she was being unfaithful, Petitioner punched her in the right eye, causing her to fall

to the floor, where he kicked and punched her several more times. (*Id.*, at 165-67.)  Then,

Petitioner ordered Marlene to sit back down, grabbed her face, kissed her on the lips, and, with a

grin on his face, told her to go to bed. (*Id.*, at 166-68.)  Marlene complied, and she did not

inform the police that she had been attacked, out of fear that Petitioner might kill her. (*Id.*,

at 169.)  The next morning, she woke up to find that her eye was bruised and swollen. (*Id.*,

at 169-70.)

From then on, Petitioner became very controlling of Marlene.  For example, he would

question her if he thought she was in the shower or kitchen for too long. (*Id.*, at 171.)  He

forbade her speak with anyone on the phone or to leave the apartment alone. (*Id.*)  When they

went outside together, Petitioner would instruct Marlene to walk close to the side of buildings, so

that he could push her head into the building if he felt that her eyes "were wandering" or

"looking at something [for] too long." (*Id.*, at 171-72.)

On January 23, 2009, Petitioner's abusive behavior escalated.  At around 7:30 p.m., Petitioner went into Marlene's bedroom and told her he wanted sex.  (*Id.*, at 174.)  Marlene declined, but Petitioner said, "Whether you give it to me or not I'm still going to take it."  (*Id.*, at 174-75.)  When Petitioner attempted to undress Marlene, she resisted by pushing, kicking, and screaming, but Petitioner hit her repeatedly until he was able to remove her clothing.  (*Id.*, at 175.)  Petitioner then grabbed Marlene's head and forced her to perform oral sex on him.  (*Id.*, at 175-76.)  Every time that Marlene tried to move away or protest, Petitioner would hit her harder.  (*Id.*, at 176-77.)  Petitioner then threw Marlene on the bed, covered her face with a pillow, pinned her wrists together above her head, and forced Marlene to engage in vaginal intercourse.  (*Id.*, at 178-79, 328.)  Marlene repeatedly said no, told Petitioner to stop, and physically resisted, but Petitioner continued to rape her while hitting her on her sides and thighs.  (*Id.*, at 178-79.)

When Petitioner finished raping Marlene, he exited the apartment and warned Marlene not to leave, stating that he had someone watching her.  (*Id.*, at 179.)  Marlene was unable to contact anyone for help because she did not have access to a telephone at that time.[3]  (*Id.*, at 181.)  Before attempting to leave the apartment through the front door, Marlene looked through a peephole and saw a friend of Petitioner's sitting outside.  (*Id.*, at 180-81.)  She also was prevented from leaving her apartment through the fire escape, because she saw that three or four more of Petitioners' friends were standing outside at the back of her building.  (*Id.*, at 179-81.)  Marlene therefore decided to remain in her apartment.  (*Id.*, at 182.)

---

[3] On cross-examination, Marlene testified that she lost her home phone service shortly before this incident because she was unable to pay her bill.  (Trial Tr., at 172, 240-45.)  Although police officers were able to contact Marlene via telephone during the investigation preceding Petitioner's arrest, it was unclear whether they communicated through a cell phone or home phone.  (*Id.*, at 358.)

4

Petitioner returned to Marlene's apartment at around midnight that night.  (*Id.*, at 182-83.)  Upon hearing Petitioner enter the apartment, Marlene pretended to be asleep, but Petitioner walked into Marlene's bedroom, grabbed her by the hair, and flung her against the wall and radiator.  (*Id.*, at 183.)  Petitioner then punched Marlene in her left eye, remarking that any bruise that resulted would match the bruise on her right eye from the January 14 attack.  (*Id.*, at 183-84.)  Petitioner continued to hit Marlene all over her body, proclaiming that he would hit her "like a man" and that he would beat her until "no one [was] going to recognize [her]."  (*Id.*, at 184-85.)  Twice, Marlene momentarily lost consciousness from the beating.  (*Id.*, at 185-86.)  When she woke up the second time, Petitioner was dragging her from her bedroom towards the doorway at the entrance of her apartment.  (*Id.*, at 186.)  Marlene attempted to alert her neighbors by screaming for help, but no one responded.  (*Id.*)

Petitioner then dragged Marlene back into her bedroom, went to the kitchen, and returned with a smile on his face.  (*Id.*, at 186-88, 191-92.)  Petitioner drew a yellow box cutter from his pocket, slid the blade in and out in the air, and asked Marlene which part of her face she liked most.  (*Id.*, at 188, 192-93.)  Petitioner then walked up to Marlene and poked her legs with the box cutter multiple times, causing her to bleed.  (*Id.*, at 193-94.)  He then rubbed the blade on Marlene's face and asked, once again, which part of her face she liked most, stating "I want to make you so nobody recognizes you when they find you."  (*Id.*, at 195.)  Petitioner then told Marlene to remove her clothes so that he could take her downstairs and beat her in public while she was naked, adding that it was "going to be fun."  (*Id.*, at 196.)

When Petitioner briefly left the bedroom to go to the kitchen, Marlene escaped through her bedroom window, onto the fire escape, and up to the roof.  (*Id.*, at 198-99.)  She ran onto the roof of the adjoining building, took the stairs down to the apartment of her neighbor, Paris

Duckett, and banged on his door for help.  (*Id.*, at 83-86, 199-201.)  Duckett opened the door, and Marlene went inside the apartment. (*Id.*, at 201.)  At that point, Petitioner stood outside, screaming for Marlene to come downstairs.  (*Id.*, at 202, 249.)  Marlene did not call 911 immediately, as she was still afraid of Petitioner, but she eventually contacted the police at some point during the following day.  (*Id.*)

At around 3:00 p.m. on January 24, 2009, Officers Jose Caraballo and Michael Vincenzi responded to a radio call of an assault in progress and arrived at Marlene's building. (*Id.*, at 28-29.)  Marlene flagged the officers down in front of her apartment building, told Officer Caraballo that she had been beaten by Petitioner, and speculated that Petitioner might still be in her apartment.  (*Id.*, at 29-31.)  The two officers entered Marlene's apartment and searched it, but they did not find Petitioner.  (*Id.*, at 34-35, 202-03.)  Officers Caraballo and Vincenzi then escorted Marlene to the hospital, where they photographed Marlene's injuries and prepared an initial complaint report and Domestic Incident Report ("D.I. Report").  (*Id.*, at 36.)  At that time, Marlene did not report that Petitioner had forced her to engage in any sexual acts.  (*Id.*, at 203-04, 255.)  At trial, Marlene testified that she refrained from doing so because the officers were male and because she was unaware that "a boyfriend could rape his girlfriend."  (*Id.*, at 325-26.)  She further testified that, while she did come into contact with a female nurse, radiologist, and social worker in the hospital, she was reticent to discuss the sexual acts with them because it was not a private environment.  (*Id.*, at 257-60.)

On January 25, 2009, Detective Kevin Murphy met with Marlene to discuss her allegations against Petitioner.  (*Id.*, at 346.)  Marlene told Detective Murphy about the physical assault that had occurred on January 23-24 and mentioned that Petitioner had been physically

abusive in the relationship.  (*Id*., at 355.)  She did not, however, inform Detective Murphy that Petitioner had raped her.  (*Id.*)

A day or two later, Marlene went home to pick up some clothes and observed Petitioner sitting in front of the staircase in the lobby of her building.  (*Id*., at 206-07.)  Petitioner followed her upstairs and into her apartment.  (*Id*., at 207-08.)  Inside the apartment, he took the photo album containing her daughter's pictures, asked her to take a good look at the pictures, and told her over and over again to "drop the charges," otherwise, the photo album would be "the only thing [she's] going to have left."  (*Id*., at 208-09.)  Petitioner did not leave Marlene's apartment that night, and he did not allow her to sleep.  (*Id*., at 210-11.)  Instead, Petitioner made Marlene rehearse how she would visit the precinct the next day and tell Detective Murphy that she wanted to drop the charges against Petitioner.  (*Id*., at 211.)

On the morning of the next day, January 27, 2009, Petitioner walked with Marlene to the precinct.  (*Id*., at 211, 349.)  When they reached an adjacent park, Petitioner stated, "I'm going to go hide.  If I see you come out of the precinct with any cops, I have somebody standing in front of your family's door right now.  Anybody who's in the house is going to die . . . ."  (*Id*., at 211-12.)  Upon meeting with Detective Murphy, Marlene informed him that she wanted to drop the charges against Petitioner, and she did not tell him that Petitioner was waiting outside.  (*Id*., at 212.)  Detective Murphy informed Marlene that, because the crime was domestic in nature, departmental policy prevented her from withdrawing her charges.  (*Id*., at 350.)  According to Detective Murphy, Marlene appeared "very fidgety and anxious and overly anxious to drop the charges," and he believed that Marlene may have been "in fear or intimidated by [Petitioner]." (*Id*., at 349-50, 356.)

On or about February 12, 2009, Marlene contacted Detective Murphy, stating that she had changed her mind, and that she wanted to press charges against Petitioner. (*Id.*, at 213-19, 274-75, 351, 358.) Marlene informed Detective Murphy that Petitioner would likely be present at her apartment early the next day, and that, if Detective Murphy were to visit the apartment in the morning, she would make some noise to signal that someone was inside. (*Id.*, at 214, 274.) Accordingly, Detective Murphy showed up at Marlene's apartment on the morning of February 13, 2009, and knocked on the door. (*Id.*, at 215.) Upon hearing the knocking, Petitioner entered the bathroom – where Marlene had turned on the shower in the hope that Detective Murphy would hear it – dragged Marlene out of the shower, pushed her head up against the mirror, and warned her to keep quiet. (*Id.*, at 215, 275, 278) No arrest was made on that occasion. (*Id.*, at 351.)

Later on that same day, February 13, 2009, Marlene convinced Petitioner that she had to bring her daughter to a doctor's appointment. (*Id.*, at 217, 279.) Upon leaving her home, Marlene hurried to her grandmother's apartment, where she called Detective Murphy and informed him that Petitioner was presently at her apartment. (*Id.*, at 217, 353, 359.) Detective Murphy and two other officers then went to Marlene's apartment and arrested Petitioner. (*Id.*, at 353-54.)

B.    **Procedural History**

1.    **Trial and Sentencing**

On June 23, 2010, Petitioner's bench trial commenced before the Honorable Megan Tallmer, J.S.C., in the Bronx County Supreme Court. (*Id.*, at 1.) During trial, the People called four witnesses to testify – Marlene, Detective Murphy, Police Officer Caraballo, and Paris Duckett; the defense did not call any witnesses. (*See generally id.*)

On October 5, 2010, during the defense's cross-examination of Marlene, Marlene testified somewhat confusingly about whether she had met with another Assistant District Attorney ("ADA") in the "complaint room" before meeting with ADA Lauren DiChiara, the prosecutor in Petitioner's criminal proceeding, whether the individual she spoke with in the "complaint room" was male or female, and whether she had disclosed the fact that Petitioner had sexually assaulted her to that individual before meeting with ADA DiChiara.  (*Id*., 282-91.)  The following colloquy then ensued:

| | |
|---|---|
| MR. BRUNO: [defense counsel] | Would Ms. DiChiara stipulate that a person who takes the story in the complaint room is an assistant district attorney? |
| MS. DICHIARA: [prosecutor] | First of all, it's not always.  In this case, it was ADA Bieder.  When she is speaking about the other woman, ADA Pascale and I met with her the first time when she came. |
| THE COURT: | Who is it, ADA Bieder? |
| MS. DICHIARA: | Yes.  He met with her in the complaint room. |
| THE COURT: | Then he walked her over? |
| MS. DICHIARA: | No, she came to our office pursuant to a subpoena and met with ADA Pascale, who called me in. |
| THE COURT: | Those are the two females she's talking about, you and Ms. Pascale? |
| MS. DICHIARA: | Yes. |

(*Id*., at 289.)  Defense counsel then elicited testimony from Marlene suggesting that the first time that she had disclosed any act of sexual violence was when she met alone with ADA DiChiara.  (*Id*., at 290.)  As that testimony appeared to be in conflict with Marlene's testimony on direct examination, ADA DiChiara attempted to rehabilitate the witness by showing her a copy of the

felony complaint drafted by ADA Bieder, which contained allegations of sexual conduct.  (*Id*., at 297-99.)

Petitioner's attorney then requested a mistrial, arguing that ADA DiChiara had acted as an unsworn witness when she interjected to clarify that the individual with whom Marlene first met in the "complaint room" was a male ADA named Bieder, and that Marlene had not met with DiChiara and Pascale, who are both female ADAs, until later.  (*Id*., at 299, 304.)  In arguing against Petitioner's mistrial motion, ADA DiChiara stated, "I was not present in the complaint room.  We've established that." (*Id*., at 300-01.)  Defense counsel responded, "No, we didn't.  Now you're testifying."  (*Id*., at 301.)

The trial court denied the request for a mistrial, and instead ordered stricken that portion of the transcript relating to the People's attempt to rehabilitate Marlene's credibility on the issue of when she first disclosed the sexual nature of the assault.  (*Id*., at 309-11.)  In making that ruling, the trial court warned ADA DiChiara not to put herself in the position of being both an advocate and a potential witness by interjecting her own credibility into the case.  (*Id*., at 309.)

On October 6, 2010, at the conclusion of the People's case, Petitioner moved for dismissal of the charges against him, arguing that the prosecution had failed to prove each crime beyond a reasonable doubt.  (*Id*., at 369.)  The court denied Petitioner's motion.  (*Id.*)

At the close of trial, on October 7, 2010, Justice Tallmer found Petitioner guilty of one count of Rape in the First Degree; one count of Criminal Sexual Act in the First Degree; two counts of Assault in the Third Degree; one count of Menacing in the Second Degree; and one count of Criminal Possession of a Weapon in the Fourth Degree.  (*See* Transcript of Summations, conducted Oct. 7, 2010 ("Summation Tr.") (Dkt. 23), at 35.)

On November 8, 2010, Justice Tallmer sentenced Petitioner to concurrent prison terms of 25 years on the counts of first-degree rape and first-degree criminal sexual act, and to concurrent prison terms of one year for each of the remaining convictions.  (*See* Transcript of Sentencing Hearing, conducted Nov. 8, 2010 ("Sentencing Tr.") (Dkt. 23), at 10.)  Justice Tallmer also imposed a 25-year term of post-release supervision.  (*Id.*)

2. **Direct Appeal**

On March 29, 2011, Petitioner filed a timely notice of appeal, and, on May 18, 2012, he filed an appellate brief, through counsel, raising two claims:  (1) that the victim's testimony was not credible, thereby rendering Petitioner's convictions for first-degree rape and first-degree criminal sexual act a violation of due process or, at least, against the weight of the evidence; and (2) that the trial court unconstitutionally severed Petitioner's relationship with his first assigned attorney.  (*See generally* Resp. Mem., Ex. 1 (Brief for Defendant-Appellant, filed May 18, 2012, ("Pet. Br.") (Dkt. 22-1)).)

On October 5, 2012, Petitioner filed a *pro se* supplemental brief, raising four claims: (1) that the evidence against him was insufficient to establish beyond a reasonable doubt every element of the crimes with which he was charged, and that the prosecution deprived Petitioner of due process by changing certain dates in the felony complaint; (2) that prosecutorial misconduct during trial and summation deprived him of his constitutional right to due process; (3) that he received ineffective assistance from his first appointed trial counsel; and (4) that the trial judge was biased against him, thereby depriving him of his constitutional right to a fair trial.  (*See generally* Resp. Mem., Ex. 2 (*Pro Se* Supplemental Brief, dated Sept. 27, 2012 ("Pet. Supp. Br.") (Dkt. 22-2)).)

By decision dated April 2, 2013, the Appellate Division unanimously affirmed Petitioner's conviction and sentence. *See People v. Sims*, 963 N.Y.S.2d 23 (1st Dept. 2013). First, with respect to Petitioner's challenge to the legal sufficiency of the evidence supporting his conviction, the Appellate Division found that his claim was "unpreserved," and, in the alternative, that the verdict was not against the weight of the evidence. *Id*. at 24. In this regard, the Appellate Division found that there was "no basis for disturbing the court's credibility determinations, including its assessment of the victim's delay in reporting." *Id*. The Appellate Division further found that Petitioner had not preserved his claim that he was deprived of his right to the continued representation of his first assigned counsel, because he had neither expressly informed the court that he wanted to continue being represented by that attorney nor disputed the court's decision to replace that attorney. *Id*. The Appellate Division also determined that Petitioner had received effective assistance of counsel under both the federal and state standards. *Id*. Finally, the court found that the remaining claims in Petitioner's *pro se* supplemental brief were unpreserved, and, as an alternative holding, rejected such claims on the merits. *Id*.

On April 8, 2013, Petitioner, through counsel, filed an application for leave to appeal to the New York Court of Appeals, in which he expressly requested that the Court of Appeals review all the issues raised in both the counseled and *pro se* briefs that Petitioner had submitted to the Appellate Division. (*See* Criminal Leave Application, dated Apr. 8, 2013 ("Leave App.") (Dkt. 51).) In a supplemental letter dated May 6, 2013, Petitioner submitted additional argument on the issue of whether the trial court had erred in terminating the representation of his first assigned counsel, but also reiterated that leave to appeal was being sought on all issues. (*See* Letter in Support of Criminal Leave Application, dated May 6, 2013 ("5/6/13 Letter")

12

(Dkt. 51-1).)  By Order dated June 7, 2013, the New York Court of Appeals denied Petitioner's

application for leave to appeal.  *See People v. Sims*, 21 N.Y.3d 1009 (2013).

### 3.   Habeas Petition

On May 31, 2014, Petitioner, proceeding *pro se*, filed his Petition in this Court,[4] raising

four claims:  (1) that the evidence was legally insufficient to convict him of first-degree rape or

first-degree criminal sexual act (Pet., at 7-17); (2) that the prosecutor's conduct during trial and

summation deprived him of his right to a fair trial (*id*., at 17-19); (3) that he was deprived of his

right to the effective assistance of trial counsel (*id*., at 20-22); and (4) that the trial court was

biased against him, and that this deprived him of his right to a fair trial (*id*., at 22-26).

On November 5, 2014, Respondent opposed the Petition by serving and filing an

opposition Memorandum of Law and Declaration, attaching the briefs submitted by Petitioner

and Respondent to the Appellate Division in connection with Petitioner's direct appeal.

(*See* Declaration in Opposition of David P. Johnson, Esq., dated Nov. 5, 2014 (Dkt. 21);

Resp. Mem.)[5]

---

[4] Although the docket of this case reflects that the Petition was filed on June 11, 2014, a *pro se* prisoner's papers are deemed filed when they are handed over to prison officials for mailing.  *See Houston v. Lack*, 487 U.S. 266, 270 (1988).  Thus, the Court will deem the Petition to have been filed on May 31, 2014, the date that Petitioner signed it, declaring, under penalty of perjury, that he had placed it in the prison mailing system.  (*See* Pet., at 28; *see also Rhodes v. Senkowski*, 82 F. Supp. 2d 160, 165 (S.D.N.Y. 2000).)

[5] On June 6, 2016, after this Court's Chambers informed Respondent's counsel that the state court record filed in this action did not include any documents indicating whether or upon what grounds Petitioner had sought leave to appeal his conviction to the Court of Appeals, Respondent also filed Petitioner's application for leave to appeal to the Court of Appeals, Petitioner's supplemental letter in support of that application, and an opposition to that application filed by the Office of the District Attorney, Bronx County.  (*See* Leave App.; 5/6/13 Letter; Opposition to Request for Leave to Appeal, dated May 14, 2013 (Dkt. 51-2).)

By letter dated November 24, 2014, Petitioner applied to this Court for an order staying this proceeding and holding it in abeyance, pending his exhaustion of his ineffective-assistance-of-counsel claims in state court.  (*See* Motion for Stay, dated Nov. 24, 2014 (Dkt. 27).)  In support of his request for a stay, Petitioner alleged that his unexhausted claims were meritorious, in that his trial attorney:  (1) failed to advise him adequately during plea negotiations; and (2) impermissibly referenced his willingness to accept guilt as to the assault charge in the defense's opening statement.  (*Id.*, at 1-2.)  On February 13, 2015, this Court denied Petitioner's application for a stay and abeyance, finding that Petitioner had not demonstrated good cause for his failure to present his unexhausted claims in state court prior to the filing of the Petition, as required under *Rhines v.* Weber, 544 U.S. 269 (2005).  (*See* Order, dated Feb. 13, 2015 (Dkt. 37).)

On March 16, 2015, Petitioner replied to Respondent's opposition to the Petition by submitting a reply brief, or "traverse."  (*See* Traverse, dated Mar. 16, 2015 (Dkt. 39).)

## DISCUSSION

## I.   APPLICABLE LEGAL STANDARDS

### A.   Statute of Limitations

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a habeas petition must be filed within one year of the latest of four dates specified by statute, usually "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review."[6]  28 U.S.C. § 2244(d)(1)(A) (2000); *see also Williams v.*

---

[6] The limitations period may alternatively begin to run on the following dates:  (1) where the petitioner was prevented from filing an application by state action, the date on which the impediment is removed; (2) where the right asserted is a newly recognized one made retroactively applicable, the date on which the constitutional right asserted was initially recognized by the Supreme Court; and (3) the date on which the factual predicate of the claim

*Artuz*, 237 F.3d 147, 150-51 (2d Cir. 2001) (judgment becomes "final" for purposes of Section 2244 upon "the completion of direct appellate review in the state court system and either the completion of certiorari proceedings in the United States Supreme Court, or – if the prisoner elects not to file a petition for certiorari – [the expiration of] time to seek direct review via certiorari").

**B.    Exhaustion of State Remedies**

As a general matter, a federal court may not consider a petition for a writ of habeas corpus unless the petitioner has exhausted the remedies available in the state courts.  28 U.S.C. § 2254(b)(1)(A); *see also Baldwin v. Reese*, 541 U.S. 27, 29 (2004); *Picard v. Connor*, 404 U.S. 270, 275 (1971).  To satisfy the exhaustion requirement, a habeas petitioner must have "fairly presented" his claims to the state courts, thereby affording those courts the "'opportunity to pass upon and correct' alleged violations of . . . prisoners' federal rights."  *Picard*, 404 U.S. at 275 (quoting *Wilwording v. Swenson*, 404 U.S. 249, 250 (1971)).  A petitioner may accomplish this in several ways, including by citing relevant provisions of the federal Constitution in his appellate brief, *see Davis v. Strack*, 270 F.3d 111, 122-23 (2d Cir. 2001), or by relying on "pertinent federal cases employing constitutional analysis," *Rustici v. Phillips*, 308 F. App'x 467, 469 (2d Cir. 2009) (internal quotation marks and citation omitted).

Aside from setting out the federal nature of his claims, the petitioner must also, for purposes of the exhaustion requirement, present those claims to "the highest court of the pertinent state."  *Larocco v. Senkowski*, 65 F. App'x 740, 742 (2d Cir. 2003); *Bossett v. Walker*, 41 F.3d 825, 828 (2d Cir. 1994) (citation omitted).  In New York, for a claim that can be raised

---

presented could have been discovered through the exercise of due diligence.  28 U.S.C. § 2244(d)(1)(B)-(D).

on direct appeal, a petitioner must first appeal his conviction to the Appellate Division and then seek "further review of that conviction by applying to the Court of Appeals for a certificate granting leave to appeal." *Galdamez v. Keane*, 394 F.3d 68, 74 (2d Cir. 2005). A request for leave to appeal to the Court of Appeals may be made by a letter submission that encloses the briefs and other documents that were before the lower courts. *See id.* A court will deem the exhaustion requirement satisfied where the "fair import" of the total application suggests a request for review of the constitutional claims raised in those submissions. *Id.* at 75-77.

Where a claim has not been exhausted in the state courts, but the petitioner no longer has any available avenue to return to the state courts to exhaust the claim, the habeas court should "deem" the claim exhausted. *See Castille v. Peoples*, 489 U.S. 346, 351 (1989); *Grey v. Hoke*, 933 F.2d 117, 120-21 (2d Cir. 1991); *cf.* 28 U.S.C. § 2254(b)(3) ("An applicant shall not be deemed to have exhausted the remedies available in the courts of the State . . . if he has the right under the law of the State to raise, by any available procedure, the question presented.").

Despite the exhaustion requirement set out in AEDPA, the statute also provides that the federal court may proceed to deny an unexhausted habeas claim, if it is apparent that the claim is without merit. 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

### C.   Federal Habeas Review of Procedurally Defaulted Claims

When a claim is decided by the state court on an independent and adequate state-law ground (*see* Discussion *infra*, at Section II(B)(1)(a)), or where it would be procedurally barred from state review (such that, as noted above, the federal court would "deem" it exhausted), the claim will be procedurally barred from federal habeas review, *see Ylst v. Nunnemaker*, 501 U.S.

797, 801 (1991), unless the petitioner can show "cause" for the procedural default, and that

"prejudice" resulted therefrom, *see Gray v. Netherland*, 518 U.S. 152, 162 (1996) ("[T]he

procedural bar that gives rise to exhaustion provides an independent and adequate state-law

ground for the conviction and sentence, and thus prevents federal habeas corpus review of the

defaulted claim, unless the petitioner can demonstrate cause and prejudice for the default."

(citations omitted)); *see Martinez v. Ryan*, 132 S. Ct. 1309, 1316 (2012); *Ramirez v. Att'y Gen. of

State of New York*, 280 F.3d 87, 94 (2d Cir. 2001) (citing *Wainwright v. Sykes*, 433 U.S. 72, 87

(1977)); *Coleman v. Thompson*, 501 U.S. 722, 749 (1991).[7]

"Cause" for a procedural default is established when "some objective factor external to

the defense" impeded the petitioner's efforts to comply with the state's procedural rule.

*Murray v. Carrier*, 477 U.S. 478, 488 (1986); *see also Ayuso v. Artuz*, No. 99cv12015 (AGS)

(JCF), 2001 WL 246437, at *8 (S.D.N.Y. Mar. 7, 2001).  More specifically, a petitioner can

show "cause" for a procedural default when (1) "the factual or legal basis for a claim was not

reasonably available," (2) "some interference by state officials made compliance [with the

procedural rule] impracticable," or (3) "the procedural default is the result of ineffective

assistance of counsel."  *Bossett*, 41 F.3d at 829 (internal quotation marks and citations omitted).

As for the "prejudice" prong, while the Supreme Court has not given "precise content" to

the term "prejudice," *see Wainwright*, 433 U.S. at 91, it has made clear that a petitioner must

show more than "a *possibility* of prejudice," and that the legal errors raised in the petition

---

[7] A defaulted claim may also be reviewed on federal habeas where a "fundamental miscarriage of justice" would result from the court's failure to review the claim, but to satisfy this exception to the procedural bar, the petitioner must make a showing of actual innocence. *See Schlup v. Delo*, 513 U.S. 298, 326-27 (1995); *Dunham v. Travis*, 313 F.3d 724, 730 (2d Cir. 2002).  "Actual innocence" means "factual innocence, not mere legal insufficiency."  *Dunham*, 313 F.3d at 730 (citations omitted).

"worked to [the petitioner's] *actual* and substantial disadvantage," *United States v. Frady*,

456 U.S. 152, 170 (1982) (emphasis in original).  This is "a significantly higher hurdle than

would exist on direct appeal," *id.* at 166, as the degree of prejudice must be sufficient "to

overcome society's justified interests in the finality of criminal judgments," *id.* at 175.  Certainly,

where a petitioner's claim lacks merit, he cannot demonstrate that his procedural default of the

claim has resulted in prejudice sufficient to overcome the procedural bar.  *See McDowell v.

Heath*, No. 09cv7887 (RO) (MHD), 2013 WL 2896992, at *25 (S.D.N.Y. June 13, 2013)

("Petitioner also cannot establish actual prejudice because this ineffective-assistance claim has

no merit."); *see also Stanley v. Smith*, No. 12cv6362 (AT) (SN), 2014 WL 5039444, at *16

(S.D.N.Y. Sept. 26, 2014) ("[I]f the underlying claim could not prevail, denying an opportunity

to raise that claim is not fundamentally unfair." (citations omitted)); *Grullon v. United States*,

No. 04cv7144 (SAS), 2006 WL 559668, at *7 (S.D.N.Y. Mar. 8, 2006) ("[Petitioner] has not

shown any prejudice because he has failed to demonstrate that his [claim] would succeed on the

merits.").

### D.   <u>Standard of Review</u>

Where a federal constitutional claim has been adjudicated on the merits by the state court,

this Court must accord substantial deference to the state court's decision under the standard of

review dictated by AEDPA.  *See* 28 U.S.C. § 2254(d); *see also Sellan v. Kuhlman*, 261 F.3d 303,

311 (2d Cir. 2001) (noting that "adjudicated on the merits" means "a decision finally resolving

the parties' claims, with *res judicata* effect, that is based on the substance of the claim advanced,

rather than on a procedural, or other, ground").  The relevant section of AEDPA provides that:

> [a]n application for a writ of habeas corpus on behalf of a person in
> custody pursuant to the judgment of a State court shall not be
> granted with respect to any claim that was adjudicated on the merits
> in State court proceedings unless the adjudication of the claim –

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established [f]ederal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  In addition, under AEDPA, where not manifestly unreasonable, a state court's factual findings are presumed correct, and can only be overcome by "clear and convincing evidence."  28 U.S.C. § 2254(e)(1).

Under AEDPA, a state court decision is "contrary to" clearly established federal law where the state court either applies a rule that "contradicts the governing law" set forth in Supreme Court precedent or "confronts a set of facts that are materially indistinguishable from a [Supreme Court] decision" and arrives at a different result.  *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).  An "unreasonable application" of clearly established federal law occurs when the state court identifies the correct governing legal principle, but unreasonably applies that principle to "a set of facts different from those of the case in which the principle was announced."  *Lockyer v. Andrade*, 538 U.S. 63, 76 (2003).  The state court's decision, however, "must have been more than incorrect or erroneous"; rather, "[t]he state court's application must have been 'objectively unreasonable.'"  *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003) (quoting *Williams*, 529 U.S. at 409).  In order to be entitled to habeas relief, the petitioner must show that "the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Id.* at 786-87.

## II.   **PETITIONER'S HABEAS PETITION**

### A.   **Timeliness of Petition**

As a threshold matter, this Court finds that Petitioner filed his federal habeas Petition within the one-year statute of limitations provided by AEDPA.

On June 7, 2013, the New York Court of Appeals denied Petitioner's request for leave to appeal from the Appellate Division's affirmance of his conviction.  *See Sims*, 21 N.Y.3d at 1009. Although Petitioner alleges that he filed a petition for a writ of certiorari in the United States Supreme Court, it is unclear whether that application was properly filed, as Petitioner states that the Supreme Court denied his petition on September 23, 2013, on the basis that it had not first been reviewed by a circuit court of appeals or district court.  (Pet., at 6.)  Nevertheless, as Petitioner filed his federal habeas petition on May 31, 2014, the Petition is timely regardless of whether his conviction became final for AEDPA purposes on September 4, 2013, 90 days after the denial of his request for leave to appeal, or September 23, 2013, the date that his petition for a writ of certiorari was rejected.  *See* 28 U.S.C. § 2244(d)(1) (one-year limitations period applies to habeas petition filed by person in state custody); *see also Epps v. Poole*, 687 F.3d 46, 49 (2d Cir. 2012) (noting 90-day period for filing petition for writ of certiorari).

### B.   **Petitioner's Habeas Claims**

Notwithstanding the fact that the Petition was timely filed, Petitioner's first, second, and fourth claims are procedurally barred from review by this Court, and Petitioner's third claim is procedurally barred, in part, and both unexhausted and plainly meritless, in part.  This Court therefore recommends that the Petition be dismissed in its entirety, for the reasons set forth below.

20

### 1.   Petitioner's Legal-Insufficiency Claim

In his first stated ground for habeas relief, Petitioner alleges that the evidence presented at trial on the counts of first-degree rape and first-degree criminal sexual act was legally insufficient to prove each element of those offenses beyond a reasonable doubt, and that his conviction for those crimes thus violated the Due Process Clause of the 14th Amendment. (*See* Pet., at 7-17.)  Specifically, Petitioner argues that Marlene's explanations as to why she delayed in reporting the sexual nature of the January 23-24 assault were inconsistent and lacked credibility, such that the trial court did not have sufficient evidence to find him guilty of the sex-based offenses with which he was charged.[8]  (*See id.*)  Although Petitioner exhausted this claim on direct appeal (*see* Pet. Br., at 20-24; Pet. Supp. Br., at 10-12; Leave App.), Petitioner's legal-insufficiency claim should nevertheless be dismissed as procedurally barred.

### a.   The Claim Is Procedurally Barred.

At the close of trial, Petitioner's counsel made a generalized motion for an order of dismissal, on the basis that the People had failed to establish each element of the charged crimes beyond a reasonable doubt.  (Trial Tr., at 369.)  On direct appeal, Petitioner argued in his counseled brief that Marlene's explanation for her delayed accusations of sexual assault had

---

[8] Petitioner also states that his due-process rights were violated because the prosecutor changed certain dates in the Felony Complaint, thus "prejudic[ing] . . . [his] case from the very beginning of the grand jury."  (Pet., at 7.)  To the extent that Petitioner seeks to raise an independent due-process claim based on deficiencies in the Felony Complaint or in his grand jury proceeding, such claims are not cognizable on federal habeas review.  *See, e.g., Lopez v. Riley*, 865 F.2d 30, 32 (2d Cir. 1989) ("[T]he petit jury's subsequent guilty verdict means . . . that the defendants . . . are in fact guilty as charged beyond a reasonable doubt.  Measured by the petit jury's verdict, then, any error in the grand jury proceeding . . . was harmless beyond a reasonable doubt." (citing *United States v. Mechanik*, 475 U.S. 66, 70 (1986)); *Cameron v. Cunningham*, No. 13cv5872 (KPF) (GWG), 2014 WL 1259672, at *9 (S.D.N.Y. Mar. 27, 2014), *report and recommendation adopted*, 2014 WL 4449794 (S.D.N.Y. Sept. 9, 2014) (dismissing petitioner's claim that trial court lacked jurisdiction due to grand jury defects on the basis that claim did not raise a cognizable federal issue).

wholly lacked credibility, such that his conviction on the charges of rape and criminal sexual act violated his constitutional right to due process.  (Pet. Br., at 20-24 (citing *Jackson v. Virginia*, 443 U.S. 307 (1979) (holding that evidence is legally insufficient if no "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt").)  Moreover, in his *pro se* supplemental brief, Petitioner raised a nearly identical claim, in which he argued that the prosecution had failed to prove beyond a reasonable doubt that his assault against Marlene included conduct of a sexual nature, and that his conviction was thus based on insufficient evidence and in violation of the 14th Amendment.  (Pet. Supp. Br., at 10-12.)  In the decision affirming Petitioner's conviction on direct appeal, however, which is the last-reasoned decision of the state courts, the Appellate Division declined to review Petitioner's legal insufficiency claim on the basis that the claim was unpreserved.  *See Sims*, 963 N.Y.S.2d at 416. As an alternative holding, the Appellate Division also rejected the claim on the merits.  *Id.*

Federal habeas review is not available where a claim has been decided by a state court, and the state court's decision "rests on a state law ground that is independent of the federal question and adequate to support the judgment."  *Coleman*, 501 U.S. at 729.  To determine that the state-law ground on which the state court rested was "truly an *independent* basis for decision" rather than "merely a passing reference, . . . such reliance on state law must be clear from the face of the opinion."  *Fama v. Comm'r of Corr. Servs.*, 235 F.3d 804, 809 (2d Cir. 2000) (emphasis added) (quoting *Coleman*, 501 U.S. at 732 (internal quotation marks omitted)); *see also Jones v. Vacco*, 126 F.3d 408, 415 (2d Cir. 1997) (to preclude federal review, "the last state court to render judgment must 'clearly and expressly state[] that its judgment rest[ed] on a state procedural bar'" (alterations in original) (citation omitted)).  Further, to be deemed *adequate*, the state procedural rule on which the court's decision was based must be a rule that is

22

"firmly established and regularly followed" by the state in question, *see Ford v. Georgia*,

498 U.S. 411, 423-24 (1991) (internal quotation marks and citation omitted), and must not have

been "misapplied in [the petitioner's] case in particular," *Cotto v. Herbert*, 331 F.3d 217, 240

(2d Cir. 2003) (internal quotation marks and citation omitted).  "The Second Circuit has made

clear that 'federal habeas review is foreclosed when a state court has expressly relied on a

procedural default as an independent and adequate state ground, even where the state court has

also ruled in the alternative on the merits of the federal claim.'"  *Lisojo v. Rock*, No. 09cv7928

(CM) (AJP), 2010 WL 1223086, at *21 (S.D.N.Y. Mar. 31, 2010) (quoting *Velasquez v.

Leonardo*, 898 F.2d 7, 9 (2d Cir. 1990)), *report and recommendation adopted*, 2010 WL

1783553 (Apr. 29, 2010).

Here, it is clear from the face of the Appellate Division's opinion that the court relied on

New York's preservation requirement in rejecting Petitioner's challenge to the legal sufficiency

of the evidence supporting his conviction.  *See Sims*, 963 N.Y.S.2d at 24 ("Defendant's legal

sufficiency claim is unpreserved and we decline to review it in the interest of justice."); *see also

Guity v. Ercole*, No. 07cv0728 (RPP), 2007 WL 3284694, at *7-8 (S.D.N.Y. Nov. 6, 2007)

(holding that the Appellate Division's statement that certain claims "were 'unpreserved' [was]

sufficient to establish that it was relying on a procedural bar as an independent ground in

disposing of the issue" (citation omitted)).  Moreover, New York's rule requiring a

contemporaneous objection in order to preserve an issue for appeal "has routinely been upheld as

an adequate and independent state procedural bar sufficient to preclude federal review."  *Mack v.

Lavalley*, No. 13cv8194 (GHW) (HBP), 2016 WL 3077877, at *14 (S.D.N.Y. Nov. 24, 2015),

*report and recommendation adopted*, 2016 WL 3077877 (May 31, 2016); *see also Whitley v.

*Ercole*, 642 F.3d 278, 286 (2d Cir. 2011) ("Our case law has long made clear that New York's contemporaneous objection rule is . . . a 'firmly established and regularly followed' rule.").

Finally, Petitioner cannot show that this preservation rule was misapplied in his case. New York's contemporaneous objection rule requires that, to preserve an issue for appeal, a party must "object to what he or she believes is a legal error in a trial court's ruling or instruction 'at the time of such ruling or instruction or at any subsequent time when the court had an opportunity of effectively changing the same.'" *Gutierrez v. Smith*, 702 F.3d 103, 110 (2d Cir. 2012) (quoting N.Y.C.P.L. § 470.05 (2)). "In effect, an objection is preserved if the objecting party (1) made his or her position regarding the ruling known to the trial court; (2) made a protest, and the trial court "expressly decided the question raised on appeal"; or (3) "without success . . . either expressly or impliedly sought or requested a particular ruling." *Downs v. Lape*, 657 F.3d 97, 102-03 (2d Cir. 2011) (quoting N.Y.C.P.L. § 470.05 (2)). To avoid the forfeiture of appellate claims, any objection, motion, or other affirmative act of protest must be sufficiently specific so as to focus the trial court's attention on the particular issue sought to be raised on appeal. *See People v. Keschner*, 25 N.Y.3d 704, 721-22 (2015); *People v. Jones*, 440 N.Y.S.2d 248, 258 (2d Dep't 1981).

In accordance with this standard, "[t]o properly preserve a challenge to the legal sufficiency of a conviction, 'a defendant must move for a trial order of dismissal, and the argument must be "specifically directed" at the error being urged.'" *Lisojo*, 2010 WL 1223086, at *23 (quoting *People v. Hawkins*, 11 N.Y.3d 484, 492 (2008)). "New York courts have consistently held that a general motion to dismiss does not preserve a challenge to the legal sufficiency of the evidence." *Luna v. Artus*, No. 10cv2565 (PKC) (KNF), 2011 WL 4373933, at *4 (S.D.N.Y. July 20, 2011), *report and recommendation adopted*, 2011 WL 4376524

(Sept. 20, 2011).  This is the case even where a motion to dismiss is explicitly based on the insufficiency of the evidence presented at trial, if that motion was directed generally at the prosecution's failure to prove its case, rather than at a specific deficiency.  *See Hawkins*, 11 N.Y.3d at 492; *see also People v. Finger*, 95 N.Y.2d 894, 895 (2000) (holding that motion to dismiss on the ground "that the prosecution fail[ed] to prove each and every element of both counts of the indictment, beyond a reasonable doubt, as a matter of law" did not preserve legal-insufficiency claim).  Thus, as the objection lodged by Petitioner's counsel at the close of trial was a general objection to the sufficiency of the prosecution's evidence (*see* Trial Tr., at 369 ("I now respectfully move that as a matter of law [the People] have failed to establish each crime to a level of beyond a reasonable doubt.")), the Appellate Division did not misapply New York's contemporaneous objection rule when it determined that this motion was inadequate to preserve the specific legal-sufficiency claim that Petitioner raised on appeal.  This adequate and independent state-law ground therefore bars Petitioner from raising the same claim on federal habeas review, unless he is able to overcome the procedural bar.

As discussed above (*see supra*, at Discussion I(C)), a habeas petitioner may overcome a procedural bar only by showing:  (1) both cause for failing to raise his claim properly in state court and prejudice resulting from the default, or (2) that the failure to address the claim on habeas would result in a "fundamental miscarriage of justice."  *Coleman*, 501 U.S. at 750.  In this instance, Petitioner does not address the legal standard applicable to federal habeas review of a procedurally defaulted claim, and he has not provided any explanation for his counsel's failure to make an objection that was sufficiently specific to preserve his legal-insufficiency claim for

appeal.[9]  As Petitioner has not shown cause for his procedural default, this Court need not reach

the question of whether Petitioner can show actual prejudice.  *See Stepney v. Lopes*, 760 F.2d 40,

45 (2d Cir. 1985) ("Since a petitioner who has procedurally defaulted in state court must show

both cause and prejudice in order to obtain federal habeas review, we need not, in light of our

conclusion that there was no showing of cause, reach the question of whether or not [petitioner]

showed prejudice.").[10]

     Nor has Petitioner demonstrated a sufficient probability that this Court's failure to review

his defaulted legal-insufficiency claim would result in a "fundamental miscarriage of justice."

*Edwards v. Carpenter*, 529 U.S. 446, 451 (2000) (citing *Coleman*, 501 U.S. at 750).  This

exception to the procedural bar is quite narrow; it is "concerned with actual as compared to legal

innocence."  *Sawyer v. Whitley,* 505 U.S. 333, 339 (1992).  To meet this standard, a petitioner

must show that "a constitutional violation has probably resulted in the conviction of one who is

actually innocent."  *Murray*, 477 U.S. at 496.  "To be credible, [a claim of actual innocence]

requires petitioner to support his allegations of constitutional error with new reliable evidence –

whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical

---

[9] Petitioner does not argue that his attorney's failure to preserve certain of the claims he raised on appeal amounted to ineffective assistance of counsel, such that it constitutes "cause" to overcome the procedural bar.  *See Edwards*, 529 U.S. at 451 (citing *Murray*, 477 U.S. at 488-89).  Even if Petitioner had made such an argument in this proceeding, though, it would not suffice to demonstrate "cause" for the procedural default, as Petitioner did not separately raise and exhaust such an ineffective-assistance claim in the state courts.  *See id.* at 452-53.

[10] Even if Petitioner had alleged cause for the default, he would be unable to establish prejudice, given that, regardless of any inconsistencies, Marlene's testimony alone was clearly sufficient to establish the elements of rape and criminal sexual act under New York law.  *See* N.Y. Penal Law §§ 130.35, 130.50; *see also McDaniel v. Brown*, 588 U.S. 120, 133 (2010) ("[A] reviewing court faced with a record of historical facts that supports conflicting inferences must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.").

physical evidence – that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995). "Without any new evidence of innocence, even the existence of a concededly meritorious constitutional violation is not in itself sufficient to establish a miscarriage of justice that would allow a habeas court to reach the merits of a barred claim." *Id.* at 316.  It is extremely rare that a petitioner will be able to satisfy the actual innocence standard.  *See id.* at 324 ("in virtually every case, the allegation of actual innocence has been summarily rejected." (citation omitted)).  Here, Petitioner has not submitted any new evidence showing that he is actually innocent, and the "fundamental miscarriage of justice" exception is therefore inapplicable.

For these reasons, I recommend that Petitioner's first habeas claim be dismissed as procedurally barred.

## 2.      **Petitioner's Prosecutorial-Misconduct Claim**

In his second ground for habeas relief, Petitioner raises three separate claims regarding the conduct of the prosecutor in this action, alleging that ADA DiChiara:  (1) either improperly introduced or failed to introduce certain evidence regarding the sex-based offenses with which Petitioner was charged; (2) made improper comments during her summation; and (3) acted as an unsworn witness by offering her own personal knowledge of events bearing on Marlene's credibility.  (Pet., at 17-19.)  Petitioner asserts that this prosecutorial misconduct deprived him of his 14th Amendment right to a fair trial.  (*Id*., at 17.)

Petitioner raised these same prosecutorial-misconduct claims in the *pro se* supplemental brief that he filed in connection with his direct appeal, as well as in his application for leave to appeal to the Court of Appeals, and, in doing so, invoked his rights under the 14th Amendment. (Pet. Supp. Br., at 13-14; Leave App.)  Petitioner has therefore exhausted the claims making up

27

his second ground for habeas relief, as the state courts had the opportunity to review and rule upon these federal constitutional claims.

In affirming Petitioner's conviction, the Appellate Division held that Petitioner's prosecutorial-misconduct claims were unpreserved, and, in the alternative, that such claims lacked merit.  *See Sims*, 963 N.Y.S.2d at 24.  Thus, it is clear from the face of the Appellate Division's decision that the court relied upon a state-law procedural ground in rejecting Petitioner's claim that the prosecutor's conduct deprived him of his 14th Amendment right to a fair trial.  Moreover, as set forth above, the rule that a contemporaneous objection is required to preserve an issue for appeal is firmly established and regularly followed by the New York state courts.  (*See supra*, at Discussion II(B)(1)(a).).  The application of this rule to Petitioner's prosecutorial-misconduct claims therefore serves as a procedural bar to federal habeas review of those claims, as long as the rule was not "misapplied in [Petitioner's] case."  *Cotto*, 331 F.3d at 240.  For the reasons set forth below, this Court finds that Petitioner's prosecutorial-misconduct claims should be dismissed as procedurally barred.

**a.    Petitioner's First and Second Claims for Prosecutorial Misconduct are Procedurally Barred Because Petitioner Did Not Raise These Claims at Trial by Contemporaneous Objection.**

This Court's review of the state court record in this matter reveals that Petitioner's trial counsel did not specifically challenge the fact that the prosecutor either elicited or failed to elicit testimony regarding the counts of rape and criminal sexual act, and did not make any objections during the prosecutor's summation.  Thus, this Court finds that the Appellate Division did not misapply New York's contemporaneous objection rule in declining to review Petitioner's first two prosecutorial-misconduct claims.  (*See supra*, at Section II(B)(1)(a) (noting that a specific contemporaneous objection is required to preserve an issue for appellate review).)  Accordingly,

these claims are barred from federal review unless Petitioner is able to demonstrate cause and prejudice with respect to his procedural default of the claims.[11]  (*See supra*, at Section I(C) (citing *Gray*, 518 U.S. at 162).)  As Petitioner has not alleged that there was any cause for his counsel's failure to object to these alleged instances of prosecutorial misconduct, Petitioner is unable to overcome the procedural bar, and I therefore recommend that his first two prosecutorial-misconduct claims be dismissed.

> **b.      Petitioner's Third Claim for Prosecutorial Misconduct Is Procedurally Barred Because Petitioner Did Not Seek Further Relief After The Trial Court Denied His Motion for a Mistrial.**

Like Petitioner's first two prosecutorial-misconduct claims, Petitioner's third such claim, in which he alleges that ADA DiChiara acted as an "unsworn witness" when she "vouch[ed] for her witness['] truthfulness" (Pet. Supp. Br., at 13-14), was rejected by the Appellate Division on the basis that it was unpreserved for appeal and, in the alternative, without merit.  *See Sims*, 963 N.Y.S.2d at 24.  With respect to this claim, however, Petitioner's counsel actually did make a contemporaneous objection directed at the prosecutor's allegedly improper attempts to rehabilitate her witness by offering her own personal knowledge of certain events.  (*See* Trial Tr., at 299.)  In doing so, counsel specifically stated that he was moving for a mistrial on the basis that the trial court had "improperly heard the [prosecutor] testify" as to gaps in Marlene's testimony.  (*Id*., at 304.)  The trial court denied the motion for a mistrial, but instead ruled that it would strike certain portions of the record.  (*Id*., at 309-11.)  In making that ruling, the trial court indicated that counsel had sufficiently alerted it to the specific basis of the motion, stating that the offending testimony was "infected by" the prosecutor's "interject[ion]" of her own credibility

---

[11] As stated above, Petitioner cannot avail himself of the "fundamental miscarriage of justice" exception to the procedural bar, as he has presented no new evidence demonstrating that he is actually innocent.  (*See supra*, at Section II(B)(1)(a).)

into the matter and the fact that she had put herself "in a position of being a potential witness and advocate." (*Id.*, at 309.)

Under New York law, a mistrial motion that is directed at the specific legal basis of a claim is generally sufficient to preserve an issue for appellate review. *See Rivers v. Smith*, No. 13cv00549 (NGG) (LB), 2015 WL 8489963, at *9 (E.D.N.Y. Dec. 8, 2015) (citing *People v. Bruen*, 523 N.Y.S.2d 883, 884 (2d Dep't 1988)). Where a court sustains an objection and issues a curative instruction, however, "a defendant must further specifically object to the curative instruction, lest the record incorrectly suggest the defendant's satisfaction with the court's response to his objection." *Id.* In the case of a motion for a mistrial that is denied, but results in the issuance of a curative instruction, the defendant can also preserve an appellate issue by renewing his motion after the court takes remedial action. *See People v. Brown*, 802 N.Y.S.2d 694, 695 (2d Dep't 2005). On the other hand, the failure to renew a mistrial motion or otherwise request further relief under these circumstances will result in the forfeiture of the claim. *See id.* ("The defendant fully acquiesced in the court's remedial action . . . by failing to interpose a further objection, renew his mistrial motion, or otherwise again raise the present contention that he was deprived of a fair trial"); *see also People v. Hicks*, 943 N.Y.S.2d 344, 345 (4th Dep't 2012) ("Defendant's contention that a mistrial should have been granted . . . is unpreserved for our review inasmuch as defendant did not ask for a further curative instruction after [the] County Court sustained his objection to the admissibility of the testimony, nor did he renew his motion for a mistrial.").

In this instance, although Petitioner's counsel did lodge a specific objection to the prosecutor's allegedly improper interjection of her own personal knowledge, he did not request further relief after the trial court ruled that it would strike the offending testimony. (Trial Tr.,

at 311-12.)  Petitioner's failure to renew his motion for a mistrial or otherwise express his

continued objection suggested that he was satisfied that the trial court's curative action was

sufficient to remedy the defect that was the basis of his mistrial motion.  *Rivers*, 2015 WL

8489963, at *9; *Brown*, 802 N.Y.S.2d at 695.  The Appellate Division therefore did not misapply

New York's contemporaneous objection rule when it rejected Petitioner's third prosecutorial-

misconduct claim as unpreserved, and, as a result, that claim is procedurally barred for purposes

of federal habeas review.  As Petitioner has not alleged cause and prejudice sufficient to

overcome this procedural bar, I recommend that the Court dismiss Petitioner's claim that his

14th Amendment rights were violated when ADA DiChiara acted as an "unsworn witness."

### 3.   Petitioner's Ineffective-Assistance-of-Trial-Counsel Claim

Petitioner's third habeas claim is that he received constitutionally ineffective assistance

from his first assigned trial counsel, John O'Connell, Esq. ("O'Connell").  (*See* Pet., at 20-22.)

In this regard, Petitioner alleges that:  (1) counsel did not adequately protect his interests during

the pretrial *Molineux* hearing, in that counsel "never injected statutory or constitutional law for

the record"; (2) counsel did not offer the D.I. Report or Felony Complaint into evidence during

trial; and (3) counsel failed to object to the prosecutor's purported misleading of testifying

witnesses.  (*Id*.)  Arguably, in connection with this last claim, Petitioner also asserts that

counsel's cross-examination of the witnesses called by the People was insufficient.  (*Id*., at 21.)

Although Petitioner claimed on direct appeal that O'Connell's representation was

constitutionally deficient, the ineffective-assistance claims adjudicated in that proceeding were

based on entirely different facts than those supporting the claims at issue here.  Specifically, in

his *pro se* supplemental brief, Petitioner argued that O'Connell had failed to "file appropriate

motions" upon being made aware of a changed date in the Felony Complaint and failed "to

object under the witness-advocate rule."[12]  (Pet. Supp. Br., at 15-16.)  Thus, although the

Appellate Division expressly determined that Petitioner "received effective assistance of counsel

under the state and federal standards," *Sims*, 963 N.Y.S.2d at 24, the specific ineffective-

assistance claims that Petitioner now raises in his habeas petition were not exhausted on direct

appeal.  *See Picard*, 404 U.S. at 275-76 ("Only if the state courts have had the first opportunity

to hear the claim sought to be vindicated in a federal habeas proceeding does it make sense to

speak of the exhaustion of state remedies.  Accordingly, we have required a state prisoner to

present the state courts with the same claim he urges upon the federal courts.").  For the reasons

set forth below, however, Petitioner's first and third claims for ineffective assistance of counsel

should be dismissed as procedurally barred, and Petitioner's second claim for ineffective

assistance of counsel should be dismissed as without merit.

**a.**     **Petitioner's First and Third Claims for Ineffective
         Assistance of Counsel Are Procedurally Barred.**

While some claims for ineffective assistance of counsel are based on off-the-record

conduct and must therefore be raised via a collateral motion under Section 440.10 of the New

York Criminal Procedure Law, which can be brought at any time after the entry of judgment,

*see Rodriguez v. Smith*, No. 10cv8306 (KMK) (LMS), 2015 WL 6509153, at *14 (S.D.N.Y.

Oct. 28, 2015); *Ortiz v. Heath*, No. 10-CV-1492 (KAM), 2011 WL 1331509, at *10 (E.D.N.Y.

Apr. 6, 2011), a record-based ineffective-assistance claim may be brought on direct appeal,

*see McDowell*, 2013 WL 2896992, at *4.  Under New York law, if a criminal defendant has

unjustifiably failed to raise a record-based claim on his one opportunity for direct appeal, a trial

---

[12] The basis for such a claim is unclear, given that, at the time that ADA DiChiara arguably interjected her own personal knowledge of events at issue in the case, O'Connell had already been replaced by Patrick L. Bruno, Esq., pursuant to the trial court's order.  (Trial Tr., at 289, 298-311.)

court is required to deny any subsequent collateral motion brought on the same ground.  *See*

N.Y.C.P.L. § 440.10(2)(c); *see also Aparicio v. Artuz*, 269 F.3d 78, 91 (2d Cir. 2001) ("New

York does not otherwise permit collateral attacks on a conviction when the defendant

unjustifiably failed to raise the issue on direct appeal.").  For that reason, an ineffective-

assistance-of-counsel claim based on matters within the trial record is procedurally defaulted for

purposes of federal habeas review if not raised on direct appeal.  *See Sweet v. Bennett*, 353 F.3d

135, 140 (2d Cir. 2003) ("[W]e conclude that [the petitioner's] appellate counsel unjustifiably

failed to argue this ineffective assistance claim on direct appeal despite a sufficient record . . . .

Accordingly, [the petitioner's] claim is procedurally defaulted for the purposes of federal habeas

review as well."); *Read v. Thompson*, No. 13cv6962 (KMK) (PED), 2015 WL 9701084, at *14

(S.D.N.Y. Oct. 21, 2015) ("[R]ecord-based ineffective assistance claims not exhausted on direct

appeal . . . are procedurally barred under state law."), *report and recommendation adopted*,

2016 WL 165716 (Jan 13, 2016).

   A claim is record-based "when a reviewing court could 'conclude that defendant's

counsel was ineffective simply by reviewing the trial record without the benefit of additional

background facts' that would need to be developed through a post-conviction motion pursuant to

[Section 440.10]."  *Chatmon v. Mance*, No. 07cv9655 (KMK) (GAY), 2011 WL 5023243, at *9

n.5 (S.D.N.Y. Oct. 20, 2011) (quoting *People v. Love*, 57 N.Y.2d 998, 1000 (1982)).  Here, the

bases for Petitioner's first ineffective-assistance claim (that Petitioner's trial counsel was

allegedly ineffective in failing to object to the introduction of certain evidence at a pretrial

*Molineux* hearing) and Petitioner's third such claim (that his counsel was allegedly ineffective in

failing to object to the prosecutor's questioning of witnesses and/or in failing to cross-examine

witnesses properly) (*see* Pet., at 20-22) would be evident from the face of the trial record.  *See*

*Rodriguez*, 2015 WL 6509153, at *15 (holding that claim that counsel failed "to elicit important supporting facts and make the necessary arguments" at a pretrial hearing was record-based); *Edwards v. Mazzuca*, No. 00cv2290 (RJS) (KNF), 2007 WL 2994449, at *17 (S.D.N.Y. Mar. 13, 2007) (holding that claims that counsel failed to cross-examine witnesses properly or put forth an adequate defense were based on matters in the record), *report and recommendation adopted*, 2007 WL 2994449 (Oct. 15, 2007); *Pearson v. Grenier*, Nos. 02cv10244, 03cv1477 (RJH) (GWG), 2004 WL 2453929, at *9 (S.D.N.Y. Nov. 3, 2004) (finding that claim that counsel failed to make timely objections to a series of legal errors was record-based), *report and recommendation adopted*, (Dec. 22, 2004).  Thus, these claims could have been raised on appeal and, as they were not, they are now procedurally barred, under state law, from review by the state courts.

Further, as Petitioner no longer has any available avenue to raise these claims in state court, they should be "deemed exhausted" for purposes of federal habeas review, giving rise to a procedural bar in this Court.  *See Castille*, 489 U.S. at 351; *Grey*, 933 F.2d at 120-21. Accordingly, federal habeas review of these claims is available only if Petitioner can overcome that bar by showing both "cause" and "prejudice."  (*See supra*, at Discussion Section I(C).)  In this instance, Petitioner has not demonstrated, or even alleged, that any external factor prevented him from raising on appeal the first and third ineffective-assistance claims contained in the Petition.  Indeed, Petitioner could not make such a showing, given that he actually exhausted a number of other record-based claims arising from O'Connell's allegedly deficient representation by including such claims in his *pro se* supplemental brief and leave application.  (*See* Pet. Supp. Br., at 15-16; Leave App.)  Petitioner is therefore unable to demonstrate "cause" for the procedural default, and, as such, this Court need not determine whether actual prejudice would

arise from the failure to consider these claims on habeas review.  *See Severino v. Phillips*, No. 05cv475 (DAB), 2008 WL 4067421, at *10 (S.D.N.Y. June 26, 2008) (citing *Stepney*, 760 F.2d at 45), *report and recommendation adopted*, 2008 WL 4067421 (Aug. 25, 2008).

### b.   Petitioner's Second Claim for Ineffective Assistance of Counsel Is Plainly Meritless.

Unlike his first and third ineffective-assistance claims, Petitioner's second such claim (arising from his counsel's alleged failure to introduce certain documents into evidence) is not based on errors or omissions that would appear on the trial record.  *See Read*, 2015 WL 9701183, at *14 (holding that failure to proffer investigator's report in evidence was not record-based); *Chatmon*, 2010 WL 7768902, at *11 (finding that claims for failure to introduce grand jury testimony and photographic evidence were not record-based).  That claim therefore remains unexhausted, as it could still be raised by Petitioner in state court, via a collateral motion under Section 440.10.  *See* 28 U.S.C. § 2254(c) ("An applicant shall not be deemed to have exhausted the remedies available in the courts of the State . . . if he has the right under the law of the State to raise, by any available procedure, the question presented.").

As it is unexhausted, this remaining ineffective-assistance claim can be dismissed only if it is meritless.  *See* 28 U.S.C. § 2254(b)(2); *Rhines*, 544 U.S. at 277.  The federal test for determining whether a defendant's constitutional right to the effective assistance of counsel was violated is set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).  To prevail on an ineffective assistance claim under *Strickland*, a habeas petitioner must generally show that (1) his counsel's performance "fell below an objective standard of reasonableness," and (2) he suffered prejudice as a result.  *Id.* at 688, 691, 694.  As to the first prong of this test, there is a strong presumption that counsel's conduct fell within the range of reasonably professional assistance.  *See id.* at 689.  With regard to prejudice, the petitioner must demonstrate "a reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

Petitioner argues that his original trial counsel, O'Connell, was ineffective in failing to introduce the Felony Complaint and D.I. Report as evidentiary exhibits for the trial court's review. (Pet., at 21.) Although Petitioner does not specify why the result of his criminal proceeding would have been different if these documents had been introduced into evidence, it appears, based on Petitioner's other arguments on appeal and in this habeas proceeding, and affording the Petition the liberal construction with which it is due, *see Green v. United States*, 260 F.3d 78, 83 (2d Cir. 2001), that he intends to make one of two possible arguments.

First, testimony at trial established that Marlene did not inform Officers Caraballo and Vincenzi that Petitioner had forced her to engage in any sexual conduct. (Trial Tr., at 203.) Only later, during the preparation of the Felony Complaint at the District Attorney's Office, did Marlene first disclose that Petitioner had subjected her to rape and criminal sexual conduct. (*Id*., at 221-22.) Thus, Petitioner may intend to argue that the discrepancy between the D.I. Report, which contained no allegations of a sexual character, and the Felony Complaint, which did include such allegations, would have led the trier of fact to conclude that Marlene fabricated such claims at some point in time after her making her initial report.

Second, Petitioner notes that Officer Caraballo testified that, when he was directed to respond to Marlene's 911 call on January 24, 2009, he was informed that the caller had substantial injuries, but that no weapons were involved. (*See* Pet., at 21; Trial Tr., at 42-43.) As such, Petitioner may be contending that introduction of the D.I. Report prepared by Officers Caraballo and Vincenzi on that date would have shown that Marlene did not initially report that Petitioner had used a weapon during the January 23-24 assault, and that she likely fabricated

such allegations later.  Given that the possession of a weapon is an element of menacing in the second degree and criminal possession of a weapon in the fourth degree, *see* N.Y. Penal Law §§ 120.14, 265.01, Petitioner may intend to argue that he would not have been convicted of those crimes if his trial counsel had introduced the D.I. Report into evidence.

With respect to either of these arguments, however, even if this Court assumes that O'Connell did fail to introduce the D.I. Report and Felony Complaint into evidence,[13] and that his performance as counsel was inadequate in that regard, Petitioner's second ineffective-assistance claim is still subject to dismissal on the basis that Petitioner has not shown that he was prejudiced by these purported deficiencies.

### i.     Sex-Based Offenses

Even if the trial court did not review the D.I. Report or Felony Complaint, the court was nevertheless aware of the presence or absence of sex-based allegations in each document. Specifically, Marlene testified that, when she first recounted the details of the assault that took place on January 23 and 24, 2009, to Officers Caraballo and Vincenzi, she did not disclose any of the sexual aspects of the incident.  (Trial Tr., at 254-55.)  Moreover, in response to the trial court's request for an offer of proof regarding whether the Felony Complaint contained allegations of sexual conduct, the prosecutor stated, "Yes.  He was charged with sex crimes out of the complaint room."  (*Id.*, at 299.)  In light of this testimony, the trial court clearly would have been aware that information concerning the sexual nature of Petitioner's attack on Marlene was included in the Felony Complaint, but not in the earlier-prepared D.I. Report.

---

[13] In Respondent's appellate brief, after stating that "Caraballo escorted Marlene to North Central Bronx Hospital, where he filled out [the] domestic incident report and photographed her injuries," Respondent cites to "People[']s Exhibits 1-3."  (Resp. Mem., Ex. 3, at 8.)  Thus, although this is not entirely clear, it appears that the D.I. Report may, in fact, have been offered into evidence by the prosecution.

Even if the trial court was unaware of the contents of the documents themselves, it was presented with substantial evidence regarding the absence of sexual allegations in Marlene's initial reports.  For instance, Petitioner's counsel both subjected Marlene to extensive cross-examination regarding her delay in reporting any sexual conduct (*id.*, at 254-63, 279-91), and argued on summation that this delay both negatively impacted Marlene's credibility as a witness and indicated that she had fabricated the sex-based charges (*see* Summation Tr., at 4-11, 14).  Indeed, in ruling on Petitioner's mistrial motion, the trial court acknowledged that it understood Petitioner's argument:  that Marlene's "lack of prompt outcry [regarding the sexual character of the attack,] when given many, many opportunities to make outcry" called into question the veracity of her subsequent allegations – allegations which led to Petitioner being charged with sex-based offenses in the Felony Complaint.  (Trial Tr., at 306-07.)  Petitioner does not explain how the ability to review either document as an evidentiary exhibit would have changed the trial court's understanding as to the contents of the documents.

### ii.      <u>Weapons-Based Offenses</u>

As Petitioner's counsel did not question Marlene about when she first reported Petitioner's use of a weapon, it is unclear from trial record whether the D.I. Report actually contains such allegations.  Officer Caraballo's testimony on cross-examination, however, indicates that it may not.  For instance, Officer Caraballo testified that, when he responded to Marlene's 911 call, he understood that there was a "[f]emale being beaten," but that "[n]o weapons were involved."  (*Id.*, at 43, 45.)

Regardless of what she initially told Officers Caraballo and Vincenzi, Marlene testified at length during trial about Petitioner's use of a weapon.  In this regard, Marlene recounted how Petitioner drew a box cutter, displayed the blade while asking Marlene "which part of [her] face

[she] like[d] best," then stated, "I want to make you so nobody recognizes you when they find

you." (*Id.*, at 188, 193-95.)  According to Marlene's testimony, Petitioner then poked her with

the box cutter several times on her legs, drawing blood.  (*Id.*, at 194.)  Marlene further testified

that she knew that the box cutter belonged to a 26-piece tool set that she kept in her kitchen.  (*Id.*,

at 191.)  In convicting Petitioner of menacing in the second degree and criminal possession of a

weapon in the fourth degree, the trial court clearly chose to credit this testimony, despite its

awareness that Marlene did not mention a weapon during her initial 911 call.  Petitioner offers no

argument as to why the trial court would have instead determined that this testimony was not

credible if it had been given the chance to review the D.I. Report, even if the document had made

no mention of the box cutter.

     Having been presented with a substantial amount of evidence regarding the underlying

facts reflected in the documents that Petitioner contends should have been introduced into

evidence, it is highly unlikely that a review of those documents would have impacted the trial

court's understanding of the above issues in any significant way.  For this reason, I recommend

that Petitioner's second ineffective-assistance-of-counsel claim be dismissed on the basis that

Petitioner has not established that he was prejudiced by his trial counsel's failure to introduce the

D.I. Report or Felony Complaint into evidence.

### 4.   Petitioner's Judicial-Bias Claim

     Petitioner's fourth habeas claim is that the trial judge "took personal interest" in his case,

"only to deprive him [of] a fair trial."  (Pet., at 22.)  In support of this claim, Petitioner describes

a number of rulings made by the trial court throughout his case (*id.*, at 22-25), and he apparently

seeks to demonstrate that these rulings evince judicial bias on the part of the court.  In this

regard, Petitioner notes that Justice Tallmer:  (1) stated that no defendant had ever waived a jury

trial before her, in her 10 years of hearing felony cases; inquired whether defense counsel agreed

with Petitioner's decision to waive a jury trial; and offered to assign another attorney for the

limited purpose of providing Petitioner with a second opinion on this issue; (2) denied

Petitioner's *Molineux* motion; (3) noted during a conference at which Petitioner did not appear

that, due to a medical problem that Marlene was experiencing, Petitioner would either have to

consent to a lengthy adjournment or move for a mistrial; (4) denied his request for a mistrial on

grounds of prosecutorial misconduct;  (5) "overlook[ed]" certain testimony regarding Marlene's

credibility; (6) denied the general motion to dismiss Petitioner made at the end of trial; (7) found

Petitioner guilty beyond a reasonable doubt despite inconsistencies in the evidence; and

(8) called Petitioner "a liar" during sentencing.  (*Id.*)

    Although the Petition does not specify the constitutional basis of this claim, Petitioner

argued on direct appeal that the trial court's prejudice so infected his case with unfairness as to

render his subsequent conviction a denial of his rights under the Due Process Clause of the 14th

Amendment.  (Pet. Supp. Br., at 17; Leave App.)  Thus, to the extent that Petitioner intends to

raise the same constitutional claim here, it is exhausted.  As the Appellate Division declined to

review this claim on the basis that it was unpreserved, however, the claim is procedurally

barred.[14]  (*See* Discussion *supra*, at Section II(B)(1)(a).)  Moreover, as Petitioner has not alleged

---

[14] This Court's review of the trial record reveals that Petitioner did not move for recusal
or otherwise object to the trial court's conduct, as would be required to preserve the issue for
appeal.  *See People v. Darling*, 714 N.Y.S.2d 393, 396 (3d Dep't 2000) ("[D]efense counsel
never moved for recusal . . . or voiced any objection to [the court's] conduct at trial.  Thus,
defendant's present claims of judicial bias and prejudice are . . . unpreserved for review . . . ."
(internal citations omitted)).

cause for the procedural default and prejudice resulting therefrom, as is required to overcome the procedural bar, I recommend that his judicial-bias claim be dismissed.[15]

## CONCLUSION

For all of the foregoing reasons, I recommend that this Petition for a writ of habeas corpus be DISMISSED in its entirety.  Further, I recommend that the Court decline to issue a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(1)(A), because Petitioner has not "made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections.  *See also* Fed. R. Civ. P. 6 (allowing three (3) additional days for service by mail). Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Valerie E. Caproni, United States Courthouse, 40 Foley Square, New York, New York 10007, Room 240, and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street, Room 1660, New York, New York 10007.  Any requests for an extension of time for filing objections must be directed to Judge Caproni.  FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBEJCTIONS AND WILL PRECULDE APPELLATE REVIEW. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir. 1992); *Wesolek v.*

---

[15] In any case, Petitioner's claim is without merit, as "judicial rulings, routine trial administration efforts, and ordinary admonishments" do not constitute a valid basis for finding bias, unless the judge relied upon extrajudicial sources in making such rulings, or unless the rulings demonstrate a "deep-seated and unequivocal antagonism that would render fair judgment impossible."  *Liteky v. United States*, 510 U.S. 540, 555 (1994); *see also Brown v. Combs*, 241 F. App'x 761, 762 (2d Cir. 2007).

*Canadair Ltd.*, 838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v. Manson*, 714 F.2d 234, 237-38 (2d Cir. 1983).

If Petitioner does not have access to cases cited herein that are reported only on Westlaw, he may request copies from Respondent's counsel. *See* Local Civ. R. 7.2 ("Upon request, counsel shall provide the *pro se* litigant with copies of [cases and other authorities that are unpublished or reported exclusively on computerized databases that are] cited in a decision of the Court and were not previously cited by any party").

Dated:  New York, New York
       July 6, 2016

                                    Respectfully submitted,

                                    DEBRA FREEMAN
                                    United States Magistrate Judge

Copies to:

Hon. Valerie E. Caproni, U.S.D.J.

Mr. Quavas Sims
10-A-5394
Auburn Correctional Facility
P.O. Box 618
Auburn, NY 13024

Respondent's counsel (via ECF)

42